**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KEITH S. HITCHINGS,

        Petitioner,

        v.

ROSANNE CAMPBELL, Warden,

        Respondent.

_____ /

No. C 05-2981 PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Before the court is the petition for writ of habeas corpus filed by state prisoner, Keith S. Hitchings ("Hitchings"), pursuant to 28 U.S.C. § 2254.  On August 15, 2005, this court ordered respondent ("respondent" or "the state") to show cause why the writ should not be granted.  The state filed an answer on October 12, 2005.  Hitchings filed a traverse on November 11, 2005.  Having reviewed the parties' papers, the record, and having carefully considered their arguments and the relevant legal authorities, the court hereby DENIES the petition.

**BACKGROUND**

**A.    Procedural History**

      On March 18, 1983, a jury convicted Hitchings of first and second degree murder in the Humboldt County Superior Court and subsequently imposed the death penalty. (Clerk's Transcript on Appeal ("CT"), p. 6-7).  On November 4, 1993, the California Supreme Court granted Hitchings' petition for writ of habeas corpus based on juror misconduct, vacated the judgment, and remanded the case to the Humboldt County Superior Court for retrial.  (CT, supra, p. 12-52).  Following the state supreme court's grant of Hitchings' habeas petition, state retrial proceedings commenced on January

11, 1994.  The district attorney declined to seek the death penalty, but retained the multiple-murder special circumstance as part of the charges against Hitchings.  The district attorney also dropped the rape-murder special circumstance allegation that was found not true at Hitchings' first trial, but proceeded on a first degree felony murder theory with respect to one of the victims, Rebecca Jensen.  After retrial, a jury found Hitchings guilty of two counts of second degree murder.  (CT, supra, p. 371-373).  The court then sentenced Hitchings to two consecutive terms of fifteen years to life.  (CT, supra, p. 486-475).

Hitchings appealed, and the California Court of Appeal affirmed the judgment on December 2, 1997.  Respondent's Exhibit ("Resp. Exh.") C.  The California Supreme Court denied Hitchings' petition for review on March 20, 1998.  Resp. Exh. D.

On March 19, 1999, the California Court of Appeal denied Hitchings' petition for writ of habeas corpus without prejudice.  Resp. Exh. E.  Hitchings re-filed the petition with the Humboldt County Superior Court, which the court denied on March 26, 2003.  Resp. Exh. F.  Hitchings then sought habeas relief from the California Court of Appeal, which it denied on April 15, 2004.  Resp. Exh. G.  The California Supreme Court also denied review on June 29, 2005.  Resp. Exh. H.

On July 21, 2005, Hitchings filed a petition for writ of habeas corpus with this court.

**B.     Factual History and Trial Evidence**

The victims, James and Rebecca Jensen, both in their eighties, were found dead in their home in Loleta, California on June 14, 1982. The windows on either side of the Jensens' front door had been broken, but the door remained locked.  Rebecca Jensen's body was found on the floor just inside the door.  James Jensen's body was found off to the left behind an overturned chair.

1    According to an autopsy report, James Jensen died from intrapontine[1] and

2  intracranial hemorrhaging resulting from a basal skull fracture.  His head was lacerated

3  several times, and extensive bruising and bleeding occurred beneath his scalp.  His

4  neck and shoulders were bruised.  His forearms were also lacerated, exposing the bone

5  at his wrists.  His skull was fractured from one side to the other, by one or more blows

6  landing between the front of his ear and his eye.  The injuries had been inflicted by an

7  instrument with a rounded surface, such as a pipe or a baseball bat.  His arm injuries

8  were consistent with attempted self-protection.

9    Rebecca Jensen also sustained blows to her head which caused intracranial

10  hemorrhaging.  The left side of her skull was fractured past the mid-line to the right side

11  of the sella.[2]  Lacerations were found on her scalp and eyebrows, and her right ear was

12  injured.  Her shoulders were bruised, and her elbow was lacerated.  Multiple abrasions

13  on her arms were determined to likely be defensive wounds.  Authorities concluded that

14  Mrs. Jensen's injuries were likely inflicted by the same kind of instrument which caused

15  Mr. Jensen's injuries.

16    At the scene, law enforcement found footprints inside and outside the house.

17  Prints inside the house and on the front door matched the soles of a pair of Hitchings'

18  boots.[3]  Police seized the boots from Hitchings' home shortly after the murders, and a

19

20    [1]Intrapontine means "within the pons of the brainstem."  The brainstem is the lowest
21  part of the brain that merges with the spinal cord.  It consists of the medulla, the oblongata,
    the midbrain, and the pons.  The pons is a rounded "eminance," or raised tissue, off the
22  front surface of the brainstem.  On-line Medical Dictionary, The Cancer WEB Project, Dept.
    of  Medical  Oncology,  University  of  Newcastle  upon  Tyne,  at
23  http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=intrapontine (last visited May 18, 2006).

24    [2] The "sella" is a depression in the middle line of the upper surface of the sphenoid
25  bone in which the pituitary gland is lodged.  North American Neuro-Opthamology Society,
    http://www.nanosweb.org/patient_info/brochures/PituitaryTumor.htm (last visited May 18,
26  2006).

27    [3]The record is unclear regarding the location of Hitchings' residence.  However, as
28  discussed subsequently, the evidence at trial placed Hitchings in the proximity of the

1   criminalist testified that the prints were definitely made by the boots.  Using DNA tests,

2   the criminalist also determined that traces of blood found on Hitchings' right boot may

3   have come from either of the Jensens, but not from Hitchings.  The police also found a

4   knife and sheath that belonged to Hitchings, and pieces of a broken bat.  Blood that was

5   consistent with Rebecca Jensen's blood type was found on the bat.

6       The evidence also revealed that two days prior to the discovery of the Jensens'

7   bodies, on June 12, 1982, Hitchings drove with his girlfriend from his home in Eureka,

8   California to Ruth Lake, California to attend a rodeo.  Hitchings drank heavily, argued

9   with his girlfriend about his drinking, and left on foot in the evening.  The next morning,

10  on June 13, 1982, several men picked up Hitchings who was hitchhiking at the time.

11  Hitchings spent the day with the men and continued to drink heavily throughout the day.

12  Late in the afternoon on June 13, 1982, the group of men dropped off Hitchings in

13  Loleta, California, the town in which the victims lived.

14      Several of the Jensens' neighbors testified at trial that they observed Hitchings

15  walking door to door looking for a place to sleep on the evening of June 13, 1982, one

16  day prior to the June 14, 1982 discovery of the Jensens' bodies.  One neighbor later

17  reported Hitchings' activities to the sheriff, who discovered Hitchings walking down the

18  road, about 200 yards from the Jensens' house.  At the sheriff's request, Hitchings

19  produced a driver's license which identified him as "Keith Sanford Hitchings."  The

20  sheriff observed that Hitchings' pants were torn and that he had scratches on his arms

21  and an open blister on his thumb.  The sheriff also noticed blood smears on Hitchings'

22  arms and boots.  Hitchings disclosed to the sheriff that he was carrying a sheathed

23  knife, but the sheriff could not find it.

24      The sheriff arrested Hitchings for public drunkenness and booked him at the

25  county jail at 11:00 p.m. on June 13, 1982.  He was released on the morning of June

26  14, 1982.  The following day, he was re-arrested after the discovery of the Jensens'

27  ─────────────────────────

28  victims' home at the time of the incident.

1   bodies.  Hitchings' knife was later recovered from the Jensens' house, but was

2   determined not to have been a weapon used in the killings.

3       At the retrial that began on March 19, 1996, the prosecution introduced a

4   substantial amount of evidence regarding Hitchings' level of intoxication at the time the

5   Jensens were killed.  Witnesses who testified about Hitchings' level of intoxication

6   included several men who spent the day with Hitchings on June 13, 1982; a bartender

7   who served him drinks; the Jensens' neighbors who observed Hitchings on the evening

8   of June 13, 1982; and the officers who were in contact with Hitchings in connection with

9   his arrest for public drunkenness on the night of June 13, 1982.

10      Shaun Scarry testified that, on the morning of June 13, 1982, he and his friends,

11  Jim Marks and Colin McNaughton, picked up Hitchings, who was hitchhiking at the time.

12  (Reporter's Transcript on Appeal ("RT"), p. 2589 l. 25-27).  Scarry testified that they

13  bought Hitchings breakfast, which included Bloody Marys, and the men continued to

14  drink all day, sporadically, but "enough to sustain a comfortable buzz without getting to

15  the point of being inebriated or incapacitated by it."  (RT, supra, p. 2591 l. 5, 24-26, 28,

16  p. 2596 l. 10-13).  Scarry stated that the group of men drank beer and hard alcohol

17  throughout the day.  (RT, supra, p. 2592 l. 7, 21-23, p. 2593 l. 9-10).  He also testified

18  that they ingested speed.  (RT, supra, p. 2594 l. 6-8).  Scarry characterized the events

19  of the day as "a bit of a binge."  (RT, supra, p. 2617 l. 16).

20      Scarry testified that, later in the day, Hitchings was responsible for the group

21  getting kicked out of a bar (the Town Club in Fortuna, California), for inappropriately

22  intervening in a friendly "ruckus" that developed between two friends in the group.  (RT,

23  supra, p. 2597 l. 2-9).  Scarry testified that towards the end of the day, Hitchings

24  became a "pitiful drunk," acting sorrowful for his actions and asking the group for

25  forgiveness.  (RT, supra, p. 2598 l. 2-5).  The men went their separate ways when

26  Scarry dropped off Hitchings around dusk in Loleta.  (RT, supra, p. 2598. l. 26-28).

27      Colin McNaughton also testified that he was among the group who picked up

28

1    Hitchings on the morning of June 13, 1982.  (RT, supra, p. 3200 l. 19).  McNaughton

2    testified that the group of men drank throughout the day, starting with Bloody Marys in

3    the morning, and that the men consumed speed in the afternoon.  (RT, supra, p. 3205 l.

4    5, 7-9).  He testified that several times throughout the day, the men stopped to buy

5    beer, and that everyone, including Hitchings, was drinking.  (RT, supra, p. 3215 l. 5-19,

6    3222 l. 5-7).  He also testified that they drank hard alcohol at the Town Club in Fortuna,

7    California.  (RT, supra, p. 3217 l. 6-10).  McNaughton testified that by the end of the

8    day, before leaving Hitchings in Loleta, the men were "gassed up," meaning drunk.

9    (RT, supra, p. 3224 l. 10-27).

10         The bartender testified that Hitchings arrived alone at the Gilded Rose bar in

11    Loleta around 5:30 or 5:45 p.m. on June 13, 1982.  (RT, supra, p. 2005 l. 14).  He

12    testified that Hitchings tripped or staggered when coming into the bar, that his eyes

13    weren't focusing properly, that his speech was a little slurred, that he had one beer, and

14    that he left at ten or twenty minutes after 6:00 p.m.  (RT, supra, p. 2007 l. 13, 25, p.

15    2008 l. 2, 19-20, p. 2010 l. 5).  The bartender also stated that he had a conversation

16    with the owner of the Gilded Rose as to whether it was "wise" to serve Hitchings.  (RT,

17    supra, p. 2019 l. 1-5).  The bartender told the owner that he would serve Hitchings one

18    beer.  (RT, supra, p. 2019 l. 6).

19         There was also testimony from residents of Loleta who were neighbors of the

20    Jensens and observed Hitchings on the evening of June 13, 1982.  Roger Beasing

21    testified that he saw Hitchings walking down the road on June 13, 1982, and noticed

22    that Hitchings was staggering and "having trouble negotiating the side of the road."

23    (RT, supra, p. 2024 l. 6, p. 2025 l. 26).  Clifford Setterlund also testified that at about

24    8:15 or 8:30 p.m. on June 13, 1982, Hitchings knocked on his door looking for "a place

25    to crash."  (RT, supra, p. 2180 l. 26, p. 2192 l. 17-18).  He testified that Hitchings

26    seemed to be upset, but was walking straight and didn't smell of liquor.  (RT, supra, p.

27    2184 l. 1-2 ).  Robin Nielsen testified that Hitchings knocked on her door and asked "to

28

crash" on her couch.  (RT, supra, p. 2128 l. 24-25).  She testified that Hitchings seemed

angry when she slammed the door.  (RT, supra, p. 2129 l. 13).  She was scared and

called her neighbors, the Setterlunds, who lived across the street.  Mrs. Setterlund told

her that Hitchings had previously been at their house.  Another one of the Jensens'

neighbors, Will Butler, testified that he heard Hitchings yelling repeatedly from the

street, in a loud sing-song voice, "[c]ountry folk are so nice."  (RT, supra, p. 3135 l. 7-

12).  He also heard Hitchings say, in a softer but angry voice, "[y]ou fuckin' people."

(RT, supra, p. 3135 l. 13-14).  Hitchings came up to Butler's front porch, and Butler

observed that he was drunk and very angry.  (RT, supra, p. 3139 l. 1).  Hitchings said

that he wanted a place to stay, but Butler did not answer the door.  (RT, supra, p. 3141

l. 15-16, 17-18).

Darling Whiting testified that Hitchings walked into their living room without

knocking and said "I need a place to crash for the night."  (RT, supra, p. 2162 l. 16-18,

p. 2165 l. 6, 13-14).  She observed that he was unsteady on his feet and swaying.  (RT,

supra, p. 2165 l. 25, p. 2166 l. 2).  Her husband, Clarence Whiting, testified similarly,

and stated that he thought Hitchings was intoxicated because he moved with slowness,

deliberateness, and a little unsteadiness "the way [he himself] used to when [he] used to

get drunk," and Hitchings' whole disposition was intoxicated. (RT, supra, p. 2206 l. 13-

16, p. 2218 l. 4-9).  Mr. Whiting, a longstanding member of Alcoholics Anonymous

("AA") thought that Hitchings had a drinking problem, notified the sheriff of Hitchings'

presence in the neighborhood, and contacted Hitchings by phone about AA on the

morning of June 14, 1982.[4]  (RT, supra, p. 2216 l. 25-28, p. 2217 l. 3-7).  During the

telephone conversation, Hitchings told Mr. Whiting that he did not remember being in

---

[4]Mr. Whiting did not know Hitchings prior to the night at issue.  He testified that he
was present at the time the officers arrested Hitchings for public drunkenness, and wrote
down Hitchings' contact information in the hope of contacting him in the future to persuade
him to join AA.  Mr. Whiting called the jail the morning following Hitchings' arrest, and
having been advised that Hitchings had been released, contacted Hitchings at the number
he took down the previous evening.  *Id.*

his house the previous evening.  (RT, supra, p. 2218 l. 22-23).  Mr. Whiting testified that he thought it was probable that Hitchings was in an alcohol blackout.  (RT, supra, p. 2219 l. 3-21).

The officer who arrested Hitchings for public drunkenness testified that Hitchings stated that he was drunk, and that Hitchings smelled of alcohol.  (RT, supra, p. 2289 l. 12, 24-25, p. 2287 l. 26).  The officer also noticed that Hitchings had scratches on his arms, an open blister on his right thumb, blood smears on his arms, and blood on his boots.  (RT, supra, p. 2290 l. 8-12).  The officer testified that the crime of "public drunk" occurs when a person is intoxicated and in such a condition that they cannot care for the safety of themselves or others.  (RT, supra, p. 2309 l. 15-18).  The officer who served as the jail shift supervisor where Hitchings was incarcerated for public drunkenness testified that Hitchings was placed in the drunk tank on the night of June 13, 1982.  (RT, supra, p. 2200 l. 10-13).

The arresting officer stated in an initial one-page report that "[Hitchings was] extremely intoxicated and could not safely care for himself."  (RT, supra, p. 2310 l. 11-12).  The officer, however, later testified at trial that use of that particular phrase was standard procedure for officers arresting individuals for public drunkenness, even if they weren't "extremely" intoxicated.  (RT, supra, p. 2329 l. 10-12, 2326 l. 18-28, p. 2338, l. 1-7).  A supervisor asked the arresting officer to prepare a second, more-detailed report after Hitchings became a murder suspect.  (RT, supra, p. 2572 l. 6-11).  The second report, in contrast to the first, stated: "The suspect did not appear to be intoxicated to the point that he could not have taken care of himself under normal conditions."  (RT, supra, p. 2581 l. 19-21).

Hitchings' former girlfriend, Shannon Pellegrini, also testified regarding Hitchings' level of intoxication on June 12, 1982, two days prior to the discovery of the Jensens. Hitchings and Pellegrini drove from Eureka, California to Ruth Lake, California on June 12, 1982.  (RT, supra, p. 3075 l. 8, 12).  Pellegrini testified that Hitchings drank a case

1   of beer, approximately twenty to twenty-four cans of beer, during the day on June 12,

2   1982.  (RT, supra, p. 3076 l. 4-7).  She testified that on the night of June 12, 1982, he

3   wandered away from their campsite in Ruth Lake and did not return.  (RT, supra, p.

4   3101 l. 25-28, p. 3102 l. 1-2).  She testified that Hitchings was a regular drinker, was

5   drunk on many occasions, and on many occasions couldn't remember where he had

6   been after drinking.  (RT, supra, p. 3093 l. 16-21, p. 3099 l. 18-22).

7          Additionally, at retrial, portions of Hitchings' testimony from his first 1983 trial

8   were read into evidence, as well as statements from a taped conversation between

9   Hitchings and his former girlfriend while Hitchings was in jail.  In that conversation,

10  Hitchings professed that he did not remember most of the events from the evening of

11  June 13, 1982.  Those statements included Hitchings' admission at his first trial that he

12  drank almost two "cold cases" on the drive from Eureka to Ruth Lake.  (RT, supra, p.

13  3193 l. 14-15).  Other statements read into evidence included Hitchings' prior testimony

14  that upon arriving in Ruth Lake, he drank a couple more beers and a glass of wine.

15  (RT, supra, p. 3229 l. 22-27).  Hitchings further testified that he took a nap during the

16  evening of June 12, 1982, but when he woke up he was groggy and drunk.  (RT, supra,

17  p. 3231 l. 1-4).  Hitchings stated that he had breakfast with the men and drank beer with

18  them throughout the day on June 13, 1982.  (RT, supra, p. 3236 l. 9-10, p. 3237 l. 22-

19  27, p. 3238 l. 8-16, p. 3239 l. 15-21, p. 3240 l. 26).  He said that by early afternoon on

20  June 13, 1982 he was already intoxicated.  (RT, supra, p. 3242 l. 9-17).  Hitchings

21  testified that he continued to drink at the Town Club where he had two or three mixed

22  drinks.  (RT, supra, p. 3244 l. 8-11).  He stated that they left the bar and went to

23  somebody's house where he snorted two lines of speed.  (RT, supra, p. 3246 l. 2-3).

24  The group of men then returned to the bar and had more drinks, at which point

25  Hitchings was getting fairly drunk.  (RT, supra, p. 3250 l. 9-10, p. 3251 l. 20).  Hitchings

26  testified that he didn't remember being at any of the victims' neighbors' houses later in

27  the evening on June 13, 1982.  (RT, supra, p. 3254 l. 13-15).  Finally, he estimated that

28

he had around twenty drinks overall on Sunday June 13, 1982.  (RT, supra, p. 3279 l. 11-12).

Hitchings' recorded statements, taped while he was in custody, from a conversation he had with his girlfriend, were admitted as follows:

> I wish - - just wish I wouldn't have got drunk so I would know where I was at through all this thing, you know.
>
> The last I remember I was in Fortuna going into a bar. The next thing I know I remember cutting myself. I remember asking the guy, can I stay at his house.  Then the next thing I know I got put in the car and that is all I can remember.
>
> I don't remember leaving Fortuna. That is all I can remember.  I remember - - the last I remember I was in a bar in Fortuna then the next thing I know I was asking that guy could I stay in his house, and the next thing I was getting thrown in jail, getting in the car.
>
> I don't know. I am just scared because I can't remember. I can't remember you know.
>
> I just wish I wouldn't have got so drunk so I could remember all this, It is not going to be too good for me not remembering now I don't think.

(RT, supra, p. 3506-07 l. 8-28, 1-5).

The defense, however, introduced evidence that Hitchings was not the only stranger present in Loleta, California on June 13, 1982.  The bartender testified that aside from Hitchings, there was also an obnoxious dark-haired man who was at the bar about the same time as Hitchings, who also drank at the bar, and also purchased beer to go.  The man then returned to the bar twice, and eventually finally left around 9:00 p.m.  (RT, supra, p. 2010 l. 9-27, p. 2011 l. 3-21).  Furthermore, there was evidence that another man, who fit the same general physical description as Hitchings and was wearing similar dress as Hitchings, was hitchhiking in the area.  Ann Tricher, a resident of Loleta,  testified that she gave a ride to a hitchhiker on June 13, 1982, and brought him into Loleta.  (RT, supra, p. 3473 l. 23-25).  She testified that he was five five, five six, blondish hair, not thin, but not too muscular, and that he had a distinct body odor. (RT, supra, p. 3475 l. 13-16).  She further testified that he was dressed in jeans, a

sleeveless Levi jacket, a red t-shirt and work boots or waffle stompers.  (RT, supra, p. 3475 l. 21-24).  She further asserted that the man made her feel uncomfortable.  (RT, supra, p. 3475 l. 27).

Hitchings' defense theory at trial was that he was innocent, and had arrived at the Jensens' house after the killings had occurred.  Defense counsel spent the majority of closing argument addressing how individual pieces of evidence supported this theory. Defense counsel argued "...you will listen to (counsel's) argument with an open mind.  I am confident if you do so, you will acquit Keith Hitchings of these charges..." (RT, supra, p. 3610 l. 18-20).  Hitchings' defense counsel also argued that Hitchings was highly intoxicated at the time the crimes were committed, stating:

> ". . . Well, first of all, let me talk about unconsciousness.  I will simply point out to you that Keith Hitchings was arrested on the evening the Jensens were killed for a crime of lacking the ability to care for his own safety or the safety of others . . . ."  (RT, supra, p. 3615 l. 1-5).

> ". . . Later around nine to nine thirty, Keith Hitchings arrived at their house in a state of severe intoxication . . . ."  (RT, supra, p. 3623 l. 25-26).

> ". . . Terribly drunk.  Terribly, terribly drunk.  That is his fault. . . ."  (RT, supra, p. 3670 l. 14-15).

> ". . . Unfortunately Keith drank to a gross excess, drank enormous amounts, and usually the combination of hard liquor . . . got him gassed, incredibly drunk.  And he doesn't remember what happened . . . You know the evidence so clearly shows this that I think it is really beyond any kind of reasonable dispute.

> And when he is talking to [his girlfriend], the taped conversation in the jail at least four different times that I read to you, talks about not remembering . . . . One of the things he says there is, 'I know it is not going to go well for me.  I know it is bad for me because I don't remember.'

> Well he is right.  It did go bad for him because he couldn't remember . . . ." (RT, supra, p. 3672 l. 26-28, p. 3673 l. 1-19).

> ". . . I don't think there is anything to suggest that that was not a sincerely articulated failure to remember.  I think he didn't remember . . . . There is a very very consistent theme here of not remembering . . . ."  (RT, supra, p. 3673 l. 28, p. 3674 l. 1-7).

> ". . . So Keith HItchings was drunk and was drunk on that day. . . ."  (RT, supra, p. 3675 l. 2-3).

However, despite defense counsel's reference to evidence regarding Hitchings'

1    intoxication, he did not explicitly argue during closing that Hitchings was unable to form

2    intent or malice because he was intoxicated.  However, tying intoxication to

3    manslaughter, defense counsel did state:

4        ". . . Manslaughter in this case would be if you are not convinced beyond a
         reasonable doubt that murder occurred but that there was a killing and
5        that you believe that the defendant was unconscious at the time and
         unable to form any kind of intent because of that unconsciousness. . ."
6        (RT, supra, p. 3613 l. 17-21)

7        ". . . If you believe it is unlawful killing but you are not convinced it was
         with malice then you find manslaughter which is a lesser offense in this
8        case and so on and so forth . . . ." (RT, supra, p. 3614 l. 23-36)

9

10       In May 1996, the jury found Hitchings guilty on two counts of second degree

11   murder, but found the multiple-murder special circumstance to be true. The trial court

12   sentenced Hitchings to two consecutive terms of 15 years to life in state prison.

13                                        **ISSUE**

14       Hitchings asserts Sixth and Fourteenth Amendment claims, alleging ineffective

15   assistance of appellate counsel.  He contends that his appellate counsel should have

16   appealed the trial court's failure to instruct the jury on the definition and elements of

17   involuntary manslaughter pursuant to CALJIC 8.45.

18                               **STANDARD OF REVIEW**

19       The petition in this case was filed after the effective date of the Antiterrorism and

20   Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply.  See

21   Lindh v. Murphy, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district court may not

22   grant a petition challenging a state conviction or sentence on the basis of a claim that

23   was reviewed on the merits in state court unless the state court's adjudication of the

24   claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable

25   application of, clearly established Federal law, as determined by the Supreme Court of

26   the United States; or (2) resulted in a decision that was based on an unreasonable

27   determination of the facts in light of the evidence presented in the State court

28

1    proceeding."  28 U.S.C. § 2254(d).

2          A state court decision is "contrary to" Supreme Court authority, falling within the

3    first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

4    that reached by [the Supreme] Court on a question of law or if the state court decides a

5    case differently than [the Supreme] Court has on a set of materially indistinguishable

6    facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Clearly established Federal

7    law" under § 2254(d)(1) is the governing legal principle or principles set forth by the

8    Supreme Court at the time the state court renders its decision.  Lockyer v. Andrade, 538

9    U.S. 63, 71-72 (2003).  This "clearly established" law refers to the holdings, as opposed

10   to the dicta, of Supreme Court decisions as of the time of the relevant state-court

11   decision.  Id. at 72.

12         Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas

13   court may grant the writ if the state court identifies the correct governing legal principle

14   from the Supreme Court's decisions but unreasonably applies that principle to the facts

15   of the prisoner's case.  Id. at 75.  However, this standard requires the state court

16   decision to be more than incorrect or erroneous.  Id.  For the federal court to grant

17   habeas relief, the state court's application of the Supreme Court authority must be

18   objectively unreasonable.  Id.  The "objectively unreasonable" standard is different from

19   the "clear error" standard in that "the gloss of clear error fails to give proper deference to

20   state courts by conflating error (even clear error) with unreasonableness."  Id.; see Clark

21   v. Murphy, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, it is not enough that a

22   federal habeas court, in its independent review of the legal question, is left with a firm

23   conviction that the state court was erroneous.  Rather, the habeas court must conclude

24   that the state court's application of federal law was objectively unreasonable.  Andrade,

25   538 U.S. at 76; Clark, 331 F.3d at 1068.

26         However, when the state court decision does not articulate the rationale for its

27   determination or does not analyze the claim under federal constitutional law, a review of

28

1   that court's application of clearly established federal law is not possible.  See Delgado v.

2   Lewis, 223 F.3d 976, 981-81 (9th Cir. 2000); see also 2 J. Liebman & R. Hertz, Federal

3   Habeas Corpus Practice and Procedure § 32.2, at 1424-26 & nn. 7-10 (4th ed. 2001).

4   When confronted with such a decision, a federal court must conduct an independent

5   review of the record and the relevant federal law to determine whether the state court's

6   decision was "contrary to, or involved an unreasonable application of," clearly

7   established federal law.  Delgado, 223 F.3d at 982.

8           When a state court does not furnish a basis for its reasoning, we have no
            basis other than the record for knowing whether the state court correctly
9           identified the governing legal principle or was extending the principle into a
            new context... [A]lthough we cannot undertake our review by analyzing the
10          basis for the state court's decision, we can view it through the 'objectively
            reasonable' lens ground by Williams [v. Taylor, 529 U.S. 362 (2000)]...
11          Federal habeas review is not de novo when the state court does not
            supply reasoning for its decision, but an independent review of the record
12          is required to determine whether the state court clearly erred in its
            application of controlling federal law.... Only by that examination may we
13          determine whether the state court's decision was objectively reasonable.
    Id.
14

15          With respect to state court findings of fact, under § 2254(d)(2), a federal court

16   may not grant a habeas petition by a state prisoner unless the adjudication of a claim on

17   the merits by a state court resulted in a decision that was based on an unreasonable

18   determination of the facts in light of the evidence presented in the state court

19   proceeding.  28 U.S.C. § 2254(d)(2).  The "clearly erroneous" standard of

20   unreasonableness that applies in determining the "unreasonable application" of federal

21   law under § 2254(d)(1) also applies in determining the "unreasonable determination of

22   facts in light of the evidence" under § 2254(d)(2).  See Torres v. Prunty, 223 F.3d 1103,

23   1107-08 (9th Cir. 2000).  To grant relief under § 2254(d)(2), a federal court must be "left

24   with a firm conviction that the determination made by the state court was wrong and that

     the one [petitioner] urges was correct."  Id. at 1108.
25

26

27

28

1

**DISCUSSION**

2

**I.    Hitchings' Ineffective Assistance of Counsel Claim**

3

**A.    Background**

4

At trial, after discussions with counsel regarding the appropriate jury instructions

5

on the issue of intoxication, the trial court ultimately instructed the jury on involuntary

6

manslaughter, killing while unconscious due to voluntary intoxication, under CALJIC

7

(California Jury Instructions) 8.47.  That instruction provides in pertinent part:

8
9

> If you find that a defendant, while unconscious as a result of voluntary intoxication, killed another human being without an intent to kill and without malice aforethought, the crime is involuntary manslaughter.

10
11

> This law applies to persons who are not conscious of acting but who perform acts or motions while in that mental state.  The condition of being unconscious does not require an incapacity to move or to act.

12
13
14

> When a person voluntarily induces [his] [her] own intoxication to the point of unconsciousness, [he] [she] assumes the risk that while unconscious [he] [she] will commit acts dangerous to human life or safety.  Under those circumstances, the law implies criminal negligence.

15

CALJIC 8.47.  The court also instructed on CALJIC 4.21,[5] which addresses voluntary

16

intoxication as related to specific intent, but did not instruct on CALJIC 8.45, which

17

governs the definition of involuntary manslaughter, and is the instruction that Hitchings

18

now contends the trial court should have given.

19

The court and counsel, in discussions, considered instructing on CALJIC 8.45.

20
21

[5]CALJIC 4.21, as given, provides:

22
23

In the crime of murder, of which the defendant is accused in Counts One and Two, a necessary element is the existence in the mind of the defendant of the specific intent to kill or mental state of malice, or with knowledge of the danger to, and with conscious disregard for human life.

24
25
26

If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether defendant had such specific intent or mental state.

27
28

If from all the evidence you have a reasonable doubt whether the defendant formed such specific intent or mental state, you must find that he did not have such specific intent or mental states.

1    However, defense counsel declined the instruction, stating ". . . [8.47] takes the place of

2    it [8.45]. We don't need [8.45]." (RT, supra, p. 3532 l. 4-5).[6]

3         CALJIC 8.45, with which Hitchings asserts the court should have instructed the

4    jury, provides in pertinent part:

5         [Defendant is accused [in Count[s] _____] of having committed
         the crime of involuntary manslaughter in violation of section 192,
6         subdivision (b) of the Penal Code.]

7         Every person who unlawfully kills a human being, [without malice
         aforethought,] [and] [without an intent to kill, and without conscious
8         disregard for human life,] is guilty of the crime of involuntary manslaughter
         in violation of Penal Code section 192, subdivision (b).

9
         There is no malice aforethought if the killing occurred in the actual
10        but unreasonable belief in the necessity to defend [oneself] [or] [another
         person] against imminent peril to life or great bodily injury.

11
         [A killing in conscious disregard for human life occurs when a killing
12        results from an intentional act, the natural consequences of which are

13   _____

14        [6]The entire conversation between the court and counsel regarding CALJIC 8.45
     occurred as follows:

15
16        THE COURT:  Now I have got your eight point four five and that will be
         returned to a place before the eight seventies.
17        MR. STEINBERG [Defense Counsel]:  Eight four five will be given though?
         THE COURT:  Yes, it will be before the eight seventies. It will follow - - let
18        me make sure what it is going to follow. It will proceed eight point four seven.
         Yes, that is where it is.
19        MR DIKEMAN [Prosecution]:  Okay. And - -
20        THE COURT:  Eight point eight zero.
         MR. STEINBERG:  Judge, I think - -
21        MR DIKEMAN:  Could we go back to eight point four five because I am - - we
         are not really proceeding on any of those theories.
22        THE COURT:  Eight four five is the misdemeanor; isn't it?
         MR. DIKEMAN:  Yes, and we are not - -
23        THE COURT:  Okay. That is not in there. That is out. You have not asked
         for that.
24        MR. STEINBERG:  Correct. No. That is correct. I am just looking - - We are
25        going with eight four seven.
         THE COURT:  Eight four seven inherently dangerous; isn't it?
26        MR. STEINBERG:  Eight four seven takes the place of it. We don't need
         eight four five.
27

28   (RT, supra, p. 3531 l. 6-28, p. 3532 l. 1-5).

dangerous to life, which act was deliberately performed by a person who knows that [his] [her] conduct endangers the life of another and who acts with conscious disregard for human life.]

A killing is unlawful within the meaning of this instruction if it occurred:

> 1. During the commission of an unlawful act [not amounting to a felony] which is dangerous to human life under the circumstances of its commission; or

> 2. In the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.

[A violation of _____Code Section[s] _____is an "unlawful act" [not amounting to a felony].]

[The commission of an unlawful act, without due caution and circumspection, would necessarily be an act that was dangerous to human life in its commission.]

In order to prove this crime, each of the following elements must be proved:

> 1. A human being was killed; and

> 2. The killing was unlawful.

On October 20, 1997, on direct appeal before the California Court of Appeal, Hitchings' appellate counsel requested leave to file a supplemental letter brief raising the argument that Hitchings "was prejudiced when the trial court failed to fully instruct the jury on involuntary manslaughter."  Pet. Hab. Exh. 3.[7]  The court of appeal denied the request.  Id.  Appellate counsel filed a second request on the same issue, which the court again denied.  Id.

Thereafter, on state habeas review, the state superior court denied relief on the issue, which Hitchings raised in a state habeas petition.[8]  In that decision, the superior

---

[7]Appellate counsel did not identify the issue early enough to include it in the opening brief.  Her request for leave stated:  "Appellant has just become aware of a potential issue that counsel believes should have been raised in Appellant's Opening Brief.  Appellate Counsel was remiss in not identifying this issue earlier."  Id.

[8]The  state  superior  court  was  the  only  California  court  to  issue  a  written  and

1   court noted that "[t]here is substantial evidence of voluntary intoxication to the point of

2   unconsciousness, extreme intoxication with no recollection of events, but there is

3   virtually no evidence of intoxication to a lesser degree."  Hitchings v. Terhune, No.

4   CV990214, Ruling on Petition for Writ of Habeas Corpus, at 13 (Super. Ct. Mar. 26,

5   2003).  Based on the evidence before it, on habeas review, the court reasoned that it

6   was correct in instructing on voluntary intoxication to the point of unconsciousness

7   pursuant to CALJIC 8.47 and on voluntary intoxication as relevant to specific intent

8   pursuant to CALJIC 4.21.  Id.  The court concluded that there was not substantial

9   evidence to support instruction pursuant to CALJIC 8.45.  Id.

10          Furthermore, since the jury was properly instructed as to voluntary intoxication as

11  relevant to specific intent and mental state, CALJIC 4.21, the court concluded that,

12  through its verdicts, the jury necessarily found voluntary intoxication did not negate

13  malice aforethought and intent to kill.  Id.  Therefore, according to the superior court,

14  neither defense counsel's failure to request the instructional definition of involuntary

15  manslaughter under CALJIC 8.45, nor appellate counsel's failure to raise the issue on

16  appeal, constituted ineffective assistance of counsel.  Id.  The court further found that

17  Hitchings failed to demonstrate that but for counsel's asserted deficiency, there was a

18  reasonable probability of a more favorable outcome.  Id. (citing People v. Lewis, 25 Cal.

19  4th 610, 646 (2001)).

20          **B.    Legal Standards**

21          The Sixth Amendment right to counsel guarantees not only assistance, but

22  effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 686

23  (1984).  Where first appeal is available as of right, the due process clause of the

24  Fourteenth Amendment guarantees the effective assistance of appellate counsel.  See

25  Evitts v. Lucey, 469 U.S. 387, 396-97 (1985).  The benchmark for determining any claim

26

27  ────────────────

28  reasoned decision on the issue because both the  California Court of Appeal and the
    California Supreme Court summarily denied relief.

- 18 -

of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the process cannot be relied upon as having produced a just result.  See Strickland, 466 U.S. at 686.  The inquiry regarding whether counsel was effective is a mixed question of law and fact.  Id. at 698.     A successful claim of ineffective assistance of counsel has two components.  First, a defendant must show that counsel's performance was deficient.  Id. at 687.  Deficient performance is "representation that falls below the objective standard of reasonableness."  See id. at 688.  Accordingly, the relevant inquiry is not what defense counsel could have proffered, but whether the choices the defense counsel made were reasonable.  See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

Second, having established deficient performance, a defendant must show that counsel's errors were serious enough to deprive the defendant of a fair, reliable trial.  Strickland, 466 U.S. at 687-88.  The test for prejudice is not purely outcome determinative - the defendant need not show that the deficient conduct more than likely altered the outcome of the case.  Id.  Instead, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

In an ineffective assistance of counsel claim, judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Id. at 689.  In the case of an ineffective assistance claim on habeas review, judicial scrutiny is "doubly deferential."  Yarbourough v. Gentry, 540 U.S. 1, 6 (2003) (per curiam).  Hitchings must demonstrate that he not only would have satisfied Strickland if his claim were being reviewed in the first instance, but that the state court's application of Strickland to the facts of his case was objectively unreasonable.  See Bell v. Cone, 535 U.S. 685, 698-99 (2002).

**C.    Analysis**

Hitchings argues that his appellate counsel's failure to appeal the trial court's failure to give CALJIC 8.45 constituted ineffective assistance of counsel.  He contends that the material factual issue of whether malice was negated by intoxication "short of unconsciousness" was removed from the jury's consideration by the court's failure to instruct on CALJIC 8.45.

Although Hitchings' ineffective assistance of counsel claim depends in part on whether the trial court had a duty to instruct on the lesser-included offense of involuntary manslaughter, the court is reviewing this claim as one for ineffective assistance of counsel as opposed to a due process claim based on instructional error.  That is because Hitchings has advanced *only* an ineffective assistance of counsel claim in state habeas proceedings below, and that is how he framed the issue in his federal habeas petition.[9]

1.    Prejudice

Both Strickland prongs – deficient performance and prejudice – depend on the necessity of the jury instruction.  The court first examines the prejudice prong of the Strickland test because the analysis is pertinent also to the deficient performance prong addressed subsequently.

Under Strickland, the element of prejudice requires "showing that counsel's errors were so serious as to deprive the defendant of a fair [appeal], [an appeal] whose result is reliable."  46 U.S. at 687.  With regard to the failure to appeal a jury instruction, an omission or incomplete jury instruction is less likely to be prejudicial than a misstatement of law.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

Federal law is clear that a trial court is not required to give an instruction unless the evidence warrants it.  See Hopper v. Evans, 456 U.S. 605, 611 (1982); Menedez v.

_____

[9]Moreover, Hitchings has never exhausted a due process claim as relates to this issue.

- 20 -

1    Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).  A defendant is entitled to the lesser-

2    included offense instruction when "'the offense on which the instruction is sought is a

3    lesser-included offense in the offense charged, and . . . the jury could rationally

4    conclude that the defendant was guilty of the lesser but not the greater offense.'"

5    United States v. Torres, 937 F.2d 1469, 1476 (9th Cir. 1991) (quoting United States v.

6    Crutchfield, 547 F.2d 496, 500 (9th Cir. 1997), cert. denied, 502 U.S. 1037 (1992)).

7            In a non-capital case, a state trial court's failure to instruct on a lesser-included

8    offense does not present a federal constitutional claim.  See Solis v. Garcia, 219 F.3d

9    922, 929 (9th Cir. 2000); Windham v. Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998);

10   Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995) (citing Bashor v. Risley, 730 F.2d

11   1228, 1240 (9th Cir. 1984)).  However, the defendant's right to an adequate jury

12   instruction on his or her theory of the case, where substantial evidence warrants the

13   instruction on the lesser-included offense, might present an exception to the general

14   rule.[10]  See Solis, 219 F.3d at 929-30.

15           Here, to establish prejudice, Hitchings must show that the trial court's failure to

16   instruct the jury pursuant to CALJIC 8.45 had a substantial and injurious effect on the

17   jury's determination that he was guilty of second degree murder.  Brecht v.

18   Abrahamson, 507 U.S. 619, 638 (1993).  He bears a heavy burden of proof in

19   contesting  the trial court's jury instructions.  Henderson, 431 U.S. at 154.  As noted, a

20   state trial court's refusal to give a jury instruction does not alone raise a cognizable

21   ground for federal habeas relief.  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir.

22   1988).  Instead, the error must infect the trial to the extent that the defendant is deprived

23   of a fair trial as guaranteed under the Fourteenth Amendment.  Id.

24           Hitchings asserts that the trial court had a sua sponte duty to instruct on the

25   lesser-included offense of involuntary manslaughter (CALJIC 8.45).  He notes that there

26

27           [10]Because this exception has not been announced by the United States Supreme
     Court, it is unclear whether it is "clearly established" federal law, upon which habeas relief
28   under section 2254(d)(1) may be granted.  See Bashor, 730 F.2d at 1240.

was substantial evidence in the record that he was highly intoxicated on the night of the killings.  See Petitioner's Memorandum of Grounds, Facts and Law Supporting Federal Habeas Corpus Petition ("Pet. Grounds"), at 5-7.  He argues that this evidence could have supported a finding by the jury that he was either intoxicated to the point of unconsciousness, or that although not unconscious, his level of intoxication made it impossible for him to form the requisite intent to commit murder.  Based on this evidence of intoxication, Hitchings argues that the judge was required to instruct on involuntary manslaughter as a lesser-included offense to murder.

The state responds that the state superior court was not objectively unreasonable in concluding that "there is substantial evidence of voluntary intoxication to the point of unconsciousness . . . but there is virtually no evidence of intoxication to a lesser degree."  The state recounts examples of evidence of Hitchings' extreme intoxication, including:  his girlfriend's estimate that he drank between twenty and twenty-four beers that day, witnesses' testimony that he appeared to be in an "alcohol blackout," and Hitchings' statement to police that he had no memory of events that occurred after his arrival in Loleta.  Respondent's Memorandum of Points and Authorities in Support of Answer ("Resp. Answer"), at 7.  The state argues that this substantial evidence supported the state court's finding that Hitchings was intoxicated to the point of unconsciousness, but not that he was intoxicated "short of unconsciousness."  The state further argues that there was not substantial evidence demonstrating that the killings were unintentional, non-malicious, or committed during the commission of an unlawful but non-felonious act, which would support the involuntary manslaughter instruction under CALJIC 8.45.

Hitchings replies that the record contains abundant evidence of intoxication short of unconsciousness to warrant an instruction of involuntary manslaughter based on intoxication just short of unconsciousness.  Petitioner's Memorandum of Grounds, Facts and Law in Support of Traverse to Answer ("Pet. Support of Traverse"), at 2.  Hitchings argues that the evidence of extreme intoxication might reasonably be interpreted by a

1   jury as intoxication to the "point of unconsciousness" or "just short of unconsciousness."

2       Hitchings further argues that because CALJIC 8.47 was the only involuntary

3   manslaughter instruction given at trial, the only reasonable interpretation of the jury

4   instructions was that involuntary manslaughter required a finding of unconsciousness.

5   Hitchings contends that prejudice occurred because the jury instructions logically and

6   reasonably removed from the jury's consideration the material issue of whether malice

7   was negated by intoxication short of consciousness.  Therefore, according to Hitchings,

8   there was no lesser-included offense option for any crime based on intoxication short of

9   unconsciousness.

10      Hitchings also contends that the jury therefore did not resolve whether he should

11  have been convicted of involuntary manslaughter based on intoxication short of

12  unconsciousness, which was a defense theory of the case.   He argues that the trial

13  court's failure to instruct the jury on this theory of the case precluded the jury from

14  considering his defense to the charges against him.

15      The court concludes that Hitchings has not demonstrated here that the superior

16  court's decision was incorrect or erroneous, much less an "objectively unreasonable"

17  application of federal law.  See Andrade, 538 U.S. at 76; Clark, 331 F.3d at 1068; Solis,

18  219 F.3d at 929.  Contrary to Hitchings' characterization otherwise, the defense theory

19  of the case was *not* that Hitchings was intoxicated to some point shy of

20  unconsciousness.  Instead, the defense theory at trial was that he did not commit the

21  crimes, but arrived at the scene after the killings occurred.  Although defense counsel

22  also presented the argument that Hitchings was highly intoxicated at the time the crimes

23  were committed, counsel and the trial court determined that CALJIC 8.47 was a better

24  fit than CALJIC 8.45.   Thus, the trial court's failure to instruct on CALJIC 8.45 did not

25  deprive Hitchings of his right to advance his theory of the case since he did not argue

26  that he was intoxicated just short of unconsciousness.  Moreover, if the jury had

27  believed that Hitchings was incapable of forming the requisite intent to commit murder,

28  they could have returned a verdict of involuntary manslaughter.

- 23 -

1
2
3
4
5
6
7
8

     The trial court's failure to instruct on CALJIC 8.45, even if erroneous, was harmless because it is not reasonably probable that the jury would have found Hitchings guilty only of involuntary manslaughter had it been instructed on CALJIC 8.45. Therefore, appellate counsel's failure to raise the instructional issue on appeal was not prejudicial, and Hitchings cannot show that but for appellate counsel's alleged deficiency there was a reasonable probability that he would have succeeded on appeal. Accordingly, the state court's decision on the issue was not objectively unreasonable. See Andrade, 538 U.S. at 76; Clark, 331 F.3d at 1068.

9

          2.     Deficient Performance

10
11
12

     Having determined that no prejudice resulted, the court is not required to address the issue regarding counsel's allegedly deficient performance.  Strickland, 466 U.S. at 697.  Nevertheless, a discussion of this prong follows.

13
14
15
16
17
18

     Hitchings asserts that appellate counsel's failure to raise the issue constitutes deficient performance.  He argues that under Strickland, the focus is on whether appellate counsel's omission of an issue on appeal was a sound strategy and whether the error, if raised, was reversible.  See e.g., Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989).  Hitchings asserts that it is not strategically reasonable for appellate counsel to omit a winning argument.

19
20
21
22
23
24
25
26

     The state responds that since the jury instruction was not warranted by the evidence, appellate counsel's failure to appeal this specific issue did not constitute deficient performance.  The state points to the superior court's determination that there was insufficient evidence to warrant instruction under CALJIC 8.45.  Resp. Answer, at 7. It notes the state court's finding in its denial of Hitchings' habeas petition that "there is substantial evidence of voluntary intoxication to the point of unconsciousness . . . but there is virtually no evidence of intoxication to a lesser degree."  Id.  Therefore, the state contends that appellate counsel did not perform deficiently.

27
28

     The court concludes that the state court's decision was not objectively unreasonable because Hitchings' appellate counsel was not deficient for failing to raise

1
2
3
4
5
6
7
8
9

on appeal the issue of the trial court's decision not to instruct on CALJIC 8.45. Appellate counsel's failure to take an action that would be futile is not deficient performance. See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996). Furthermore, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue on appeal. See Jones v. Barnes, 463 U.S. 745, 753-54 (1983). Often times, appellate counsel will choose not to raise an appealable issue in order to focus on arguments that are more likely to be successful. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989). In fact, "the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." Id.

10
11
12
13
14
15
16
17
18
19

        Review of the record reveals that appellate counsel did raise a similar issue on appeal regarding the trial court's instruction on involuntary manslaughter. See Exhibits in Support of Petition for Writ of Habeas Corpus ("Pet. Hab. Exh."), Exh. 3. She advanced a slightly different argument than Hitchings made in the state habeas proceedings and before this court, and the state court denied relief on those claims. It is, therefore, likely that appellate counsel's inclusion of the specific issue before this court on direct appeal would have been just as futile as her other arguments regarding jury instructions, which were rejected by the state courts. Therefore, it is unlikely that appellate counsel's omission can be considered deficient under Strickland. Moreover as discussed above, even if it were deficient, it was not prejudicial.

20

### CONCLUSION

21
22
23

        For the reasons set forth above, Hitchings' petition for a writ of habeas corpus is **DENIED.** This order fully adjudicates the motion listed at No. 1 of the clerk's docket for this case and terminates all other pending motions. The clerk shall close the file.

24
25

        **IT IS SO ORDERED.**

26

Dated: May 23, 2006

_____
PHYLLIS J. HAMILTON
United States District Judge

27
28